FILED
IN OPEN COURT

MAR 18 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel MAGDALIS LOPEZ,<br><br>Plaintiff/Relator,<br>v.<br><br>STRAYER EDUCATION, INC.,<br>STRAYER UNIVERSITY, INC.,<br>Defendants. | Civil Action No. 1:08-cv-589 |

## Memorandum Opinion

This matter comes before the Court on Defendants' Motion to Dismiss (Dkt. no. 48) pursuant to FED. R. CIV. P. 12(b)(1). Upon consideration of the Motion and Relator's response thereto, and for the reasons stated below, it is hereby ORDERED that Defendants' Motion to Dismiss (Dkt. no 48) is GRANTED. After careful consideration, the Court concludes that it lacks jurisdiction over Relator Lopez's claims under the "public disclosure" bar to jurisdiction imposed by the False Claims Act. *See* 31 U.S.C. §3730(e)(4)(A).

Further, as discussed herein, pending before the Court are Defendants' Motions for Reconsideration (Dkt. nos. 70, 73). For the reasons that follow, Defendants' Motions for Reconsideration (Dkt. nos. 70, 73) are hereby DENIED as moot.

### I. Background

This is a *qui tam* action brought under the False Claims Act ("FCA"). The pertinent factual allegations in this case are as follows.

Strayer University ("Strayer") operates online and physical campuses, offering associate and masters degrees in a number of fields of study. Strayer participates in student financial assistance programs under Title IV of the Higher Education Act. Since

1

Strayer is an "eligible" institution, students attending Strayer are eligible to receive federally subsidized loans. In other cases, the money is supplied by a private lender, but the government guarantees the loans in case of default.

In order to be considered an "eligible institution" and participate in these loan programs, Strayer must meet certain requirements. One of these requirements is that an institution "will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . ." 20 U.S.C. §109(a)(20) (often referred to as the Higher Education Act's "incentive compensation ban").

The underlying concern here is that institutions, motivated by profit rather than a legitimate educational purpose, will recruit unqualified students who will then find themselves unable to repay these loans, causing a significant loss to the U.S. government which: 1) pays the funds directly to the schools on behalf of the students; or 2) guarantees other loans and thus is liable in the event of default. Thus, the ban on incentive payments and commissions is meant to curb eligible schools from recruiting unqualified students simply to fill quotas and turn a profit, which ultimately works to the detriment of the U.S. government. However, clearly not all compensation violates the incentive compensation ban. To clarify this point, the Department of Education promulgated a "safe harbor" provision which permits:

> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not

considered an adjustment.

34 C.F.R. § 668.14(b)(22)(ii)(A).

In order to participate in federal financial aid programs, Strayer enters into Program Participation Agreements ("PPAs") with the Department of Education, which are essentially signed understandings of the duties and obligations of schools wishing to participate in programs under Title IV. Thus, a PPA is conditioned upon, and serves as an institution's certification of, compliance with (*inter alia*) the "incentive compensation ban."

Lopez filed her Complaint in the instant suit on June 5, 2008, bringing claims under the FCA on a "false certification" theory of liability. This "two-step" theory of FCA liability, recognized in *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005), is predicated on Strayer's purported fraudulent representations in PPAs that it is in compliance with Title IV's incentive payment rule.

## II. Legal Standard

In considering a motion to dismiss made pursuant FED. R. CIV. P. 12(b)(1) which attacks the viability of jurisdictionally significant allegations, the Court may probe into the record and is not required to accept all jurisdictional allegations by the nonmoving party as true, as it would in a motion made under Rule 12(b)(6) or a "facial" attack to jurisdiction under 12(b)(1). *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). Relator Lopez has the burden of establishing jurisdiction. *Id.*; *see also U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (31 U.S.C. § 3730(e)(4) offers the "jurisdictional facts" which a relator has the burden of proving by a preponderance to survive Defendants' Rule 12(b)(1) motion). In an FCA case like the present, this means

that Lopez bears "the burden of proving that the allegations underpinning [her] FCA claims were not 'based upon' [a public disclosure]." *Id.*

### III. Analysis

The False Claims Act ("FCA") contains a jurisdiction-stripping provision for claims "based upon" three enumerated categories of public disclosures. These three categories are: (1) federal criminal, civil, or administrative hearings;[1] (2) congressional, administrative or Government Accounting Office reports, hearings, audits or investigations; and (3) reports from the news media. 31 U.S.C. §3730(e)(4)(A).

The aim of this provision is to avert "parasitic" actions by *qui tam* relators which, "rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud." *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994). As this District has previously recognized, it is only sensible in the FCA context that "the complainant must contribute something to the suit if he is to benefit from it financially." *United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F. Supp. 1010, 1020 (E.D. Va. 1995). This case presents a relator who fails to contribute anything meaningful to the suit, and is therefore barred from benefiting from it financially.

In the typical FCA case, the proper progression of analysis of a jurisdictional challenge under §3730(e)(4) requires the Court to ask: (1) whether there was a "public disclosure," and if so, (2) whether the *qui tam* action is based upon the disclosure.[2] In

---

[1] This Circuit recognizes that "a 'civil hearing' encompasses the filing of a civil complaint and that allegations contained in such a complaint are "publicly disclosed" for purposes of section 3730(e)(4)(A)." *Grayson v. Advanced Management Technology, Inc.*, 221 F.3d 580, 582 (4th Cir. 2000)(citations omitted).
[2] Even if a relator's claims are "based upon" a public disclosure, a relator can maintain her suit if she establishes that she is an "original source" of the information in her complaint. However, as §3730(e)(4)(B) clarifies, "[f]or purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based *and has voluntarily provided*

4

this case, however, the Court finds it instructive to first discuss the source of Lopez's allegations, which, in turn, reveals that Lopez cannot meet her "burden of proving that the allegations underpinning [her] FCA claims were not 'based upon' [a public disclosure]." *Vuyyuru*, 555 F.3d at 348.

### A. What is the source of Lopez's claims and are they "actually derived" from a public disclosure?

In answering whether an action is "based upon" a public disclosure, this Circuit employs a strict reading of the "based upon" requirement in §3730(e)(4) which mandates that the Court is deprived of jurisdiction only if Lopez "actually derives" her claims from one of the three categories of public sources enumerated in the statute. *Siller*, 21 F.3d at 1348.[3] While this definition of "based upon" is undoubtedly more demanding than the majority view, this Circuit nonetheless recognizes the aim of the public disclosure bar is finding a "golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *U.S. ex rel. Wilson v. Graham Cnty Soil & Water Conservation Dist.*, 528 F.3d 292, 306 (4th. Cir. 2008)(citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)).

---

*the information to the Government before filing an action under this section which is based upon the information.*" (emphasis added). The parties agree that the Relator did not sufficiently disclose information to the Government prior to filing her suit to qualify as an "original source," and thus, this element of the statute is not at issue here.

[3] All other circuits apply a broader test to determine whether a relator's allegations are "based upon" public disclosures. In those circuits, "a qui tam suit is 'based upon' a public disclosure whenever the allegations in the suit and in the disclosure are the same, 'regardless of where the relator obtained his information.'" *U.S. ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292, 308 (4th Cir. 2008). Until recently, at least one panel in the Seventh Circuit also used the Fourth Circuit's "derived from" standard, but the Seventh Circuit changed course in *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915-16 (7th Cir. 2009), adopting the majority view.

5

This case presents an opportunistic plaintiff who is precisely the type of litigant the public disclosure bar aims to discourage.

Among the "critical elements" Lopez must allege in order to establish a "false certification claim" are: "(1) a false statement or fraudulent course of conduct, (2) made with *scienter*, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006). It is clear that Lopez knows no facts derived from her own experiences which might serve as a basis for alleging these elements, which, in turn, exposes the true source of the allegations in her Complaint. Put another way, Lopez possesses no facts which enable her to allege "that the University not only knew, when it signed the phase-one application, that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark." *Main*, 426 F.3d at 917.

Strayer deposed Lopez on December 14, 2009. After reviewing this deposition in its entirety, the Court concludes that Lopez is not the source of the vast majority of the critical factual allegations contained in her Complaint.

First, Lopez has no personal knowledge of what false statements Strayer purportedly made, nor whether Strayer made them with the requisite *scienter*. In her deposition, Lopez proved unable to plausibly identify any specific "false" claim made by Strayer. *See* Dep. Tr. 13-14, 17. When pressed on this issue, Lopez responded:

> Oh. They were getting funds, you know, from the government saying that they were -- not be given [sic], you know -- you know, on their -- you know, they were given – they were obtaining funds and they were doing false certifications to the government based on their agreements of, you know, receiving the funds.

6

*Id.* at 18:1-7.

Lopez equivocated when asked about her understanding of the requirements of Title IV before talking to Mr. Matusheski, and ultimately only gave some indication that she understood that Title IV prohibited "certain ways to compensate and promote and, you know, not based on registrations." *Id.* at 34:16-18. When questioned further, Lopez was completely indefinite as to where she gleaned even this basic understanding of Title IV, saying that she had seen it on "communications channels." *Id.* at 39:16-17. Lopez attested to the fact that Strayer specifically instructed her that admissions officers were never to get directly involved with the financial aid process with prospective students. *Id.* at 232. She also confirmed never having a discussion of Title IV's compensation prohibitions with anyone at Strayer. *Id.* at 235

While the Court does not penalize Lopez for lacking an understanding of the legal nuances of an FCA claim brought under Title IV, Lopez's answers reveal that she had no actual knowledge as to what made any statement offered by Strayer to the government "false":

> Q. Were you aware, before talking to any of your attorneys in this case, of Strayer making any false claims to the government?
> A. I'm not an attorney. I cannot answer that.
> ...
> Q. What was the false claim that Strayer made?
> A. I'm not an attorney. I cannot give you details related to that.

*Id.* at 13-17.[4] Without even a basic understanding of these important facts, it is clear Lopez's Complaint is "actually derived" from something other than her own personal knowledge or experiences as a Strayer employee.

---

[4] Lopez repeatedly cloaked her inability to answer factual questions by responding "I'm not an attorney" throughout the course of her deposition.

Tellingly, this is not the first time Lopez has brought suit against her former employer. Lopez filed and settled a Fair Labor Standards Act case against Strayer in 2007. As part of that settlement, Lopez signed a release indicating that she was not aware of any further claims against Strayer when signing the release. When asked about this, Lopez responded:

> Q. Was that promise true or did you know of *any* claims against Strayer?
> A. At that moment, I didn't know.

*Id.* at 89:17-19 (emphasis added).[5] Indeed, significant portions of Lopez's deposition involved Strayer's counsel straining to get an answer as to when Lopez "became aware" of her Title IV claim against Strayer, to little avail. *See Id.* at 95, 96.

As noted above, a key facet of Lopez's FCA claim is necessarily based on the representations made by Strayer to the government in its PPAs. However, when asked about this subject, Lopez specifically stated that she did not know what a program participation agreement was, nor had she ever heard of a fiscal operations report and application to participate. *Id.* at 119-20. Though Lopez stated she knew Strayer has "an agreement with the government," *Id.* at 124:13-14, she was incapable of answering what that "agreement" was or how she knew of it. *Id.* at 124-29. Without any knowledge of the details of Strayer's representations to the government, Lopez clearly is not the source

---

[5] Just before Lopez left Strayer, she tendered a resignation letter which stated:
> I want to thank you for all you have done for me here at Strayer University... It is with great sorrow that I am hereby tendering my resignation...I have accepted a Supervisory Survey Statistician position with the Federal Government, U.S. Department of Commerce, Bureau of the Census in Charlotte, North Carolina...This decision has nothing to do with the exceptional opportunity you have provided me here. You and the company have been more than fair with me, and I genuinely appreciate all your support...I would like to thank you for the experience of having worked for Strayer University, a truly outstanding organization...

Def. Ex. 5. As mentioned, in the time since Lopez's "exceptional opportunity" at Strayer, this is the second lawsuit she has initiated against her former employer.

of the Complaint's allegations that Strayer's representations to the government were false and made with the requisite intent. *See, e.g.,* Compl. at ¶ 43 ("At the time of signing its PPA with the DOEd, and during the period of the PPA's expiration, Strayer knew that its false certifications of compliance with the enrollment and financial aid prohibition were false."); ¶ 44 ("Accordingly, Strayer signed and entered into each PPA fraudulently, intending fraudulently to induce the DOEd to treat Strayer as an eligible institution..."). All of this is vital factual information a legitimate relator must have if she is to plausibly allege that an institution "planned to continue paying [banned compensation] while keeping the Department of Education in the dark." *Main*, 426 F.3d at 917.

As the preceding paragraphs indicate, particularly troubling in this case is how little Lopez understood about the majority of the specific factual allegations in her Complaint. When asked to identify any sentence which originated from her own knowledge in Paragraphs 49, 50, and 51 of her Complaint, Lopez was evasive and unable to identify a single one. Depo. Tr. at 173. The same was true for Paragraphs 43-72.

> Q. Do you have any factual knowledge of any of the statements in your complaints from paragraphs 43 through 72?
> A. I have knowledge.
> Q. What knowledge? Point to – me to one factual statement that you knew before talking to [Relator's counsel].
> A. (after objection by counsel) I'm not an attorney. You know, I cannot give you, you know, like, details.

*Id.* at 181. While it is not unusual for a plaintiff to lack a full understanding of legal terminology in their complaint, particularly as it pertains to, *e.g.*, jurisdiction, venue, or the specific elements of a cause of action, Paragraphs 43-72 of Lopez's Complaint all fall under the *"Facts"* section of the Complaint. *See* Compl. at 5-20. The Court views this as compelling evidence that Lopez's Complaint is actually derived from an outside source.

9

The "facts" in the Complaint about which Lopez gave a stronger indication of understanding mostly pertained to Strayer's compensation practices, but even in this area Lopez's understanding was shockingly deficient.

As noted above, a key aspect of Lopez's case is whether Strayer gave raises to its employees on a quarterly basis, which would contravene the safe harbor provision provided in 34 C.F.R. § 668.14(b)(22)(ii)(A). When asked about this allegation, Lopez was unable to say whether she was aware of any admissions officer at Strayer getting raises on a quarterly basis:

> Q. Strayer didn't give raises on a quarterly basis, did they?
> A. I don't remember that fact well right now.
> Q. You don't know of anybody getting – any admissions officer at Strayer getting raises on a quarterly basis, do you?
> A. I know it was like – you know, I don't remember if it was like a quarterly or every six months.
> ...
> Q. Okay. But people weren't promoted on a quarterly basis, correct?
> A. I don't know those facts.
> ...
> Q. Okay. And you don't know anybody getting a quarterly raise, do you?
> A. I think it was every six months or something...

Depo. Tr. at 206-11. Further, when asked whether she had knowledge of anyone receiving anything other than an *annual* pay raise, Lopez was only able to respond by saying she received a $50 bonus for completing training and a $20 gift certificate to a grocery store which her other coworkers also received, despite the fact that she never met any of her "recruiting goals." *Id.* at 207-08. Further, when asked specifically about other admission officers' salaries during the relevant period of time, Lopez indicated only that she had discussed compensation with a Dorina Wilson, though Lopez was then unable to answer what Ms. Wilson's salary was or speak to the amount she received as a raise for

10

2004. *Id.* at 215-16. Lopez also claims to have discussed compensation with a coworker named Todd Legrant. *Id.* at 216. While she believed he made $25,000 in salary, she admitted to having never discussed any raise he might have received. *Id.* at 217. Ultimately, Lopez has no personal knowledge of why or when any of her coworkers received adjustments in their salaries.

Regarding her own compensation at Strayer, Lopez relies exclusively on her experience with her supervisors where she was encouraged to work harder to enroll more students. Lopez recounts having a meeting with her manager in which he went over an evaluation form with her, which discussed her performance on the job in a number of areas beyond simply meeting recruiting goals. *Id.* at 245-51. Among these criteria were "knowledge of the job," "performs well under pressure," "punctuality," "establishes priorities," in addition to "recruiting ability." *Id.* at 256-250. In her deposition, Lopez confirmed that she knew she was evaluated on these criteria when she was considered for a raise. *Id.* at 258. Lopez concludes that being evaluated as needing to work harder to enroll more students equates to job performance based on successful enrollments alone. That conclusion, however, ignores the fact that the critique was also based on her failure to make more calls, perform well under pressure, or meet any of the other various criteria listed on the evaluation form. In fact, despite never meeting her goals, Lopez admits receiving a raise at the end of 2004. *Id.* at 209.

Thus, contrary to Relator's counsel's arguments, there is *every* indication "that Relator, an employee of Strayer for nearly a year and a half, failed to bring forth any independently discovered information of fraud." Relator's Opp. at 24. Lopez's deposition reveals that she has no plausible basis to allege that Strayer provided "any

commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid" to its employees. 20 U.S.C. §109(a)(20). Further, without knowing what a PPA is, much less whether Strayer even submitted one, or what Strayer's intent was in doing so, it is absurd to maintain that Lopez could allege that Strayer "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government" as required by 31 U.S.C. § 3729(a)(2).[6]

Given the absolute dearth of knowledge Lopez possesses about her FCA claim, the source of the factual allegations in her Complaint remains in question. To answer that question, the Court proceeds to an analysis of the sources available to the public generally, and Lopez's counsel specifically. Based on this analysis, the Court concludes that Lopez fails to meet her burden of proving that her allegations are not "actually derived" from public sources.[7]

### B. Was there a "public disclosure" of the critical elements of Lopez's case?

Reduced to their simplest form, Strayer points to two groups of "public disclosures" upon which Lopez bases her allegations: 1) news reports, congressional hearings, and administrative reports; and 2) information from prior civil cases against

---

[6] Pursuant to the appeal of an evidentiary ruling by the Magistrate Judge, the Court took the opportunity to review, *in camera*, Relator's "disclosure of material evidence" which she submitted to the government at the outset of this action. After careful review, the Court concludes that this disclosure suffers from the same infirmities as the Complaint and underscores Lopez's lack of actual knowledge of Strayer's practices and activities. The disclosure further convinces the Court that this case is based entirely upon counsel's own preconceived theory of this case, which was wholly separate from anything provided by Lopez. Thus, this "disclosure" brought no credible allegation of fraud to the government's attention and only serves to confirm that Lopez's position as a *qui tam* relator is little more than fanciful.

[7] In support of her Opposition to Defendants' Motion, Relator Lopez submitted an affidavit insisting that she is the originator of the core facts from which the allegations in her Complaint are formed. *See* Lopez Aff. at 2-6. However, Lopez's generic declarations fall grossly insufficient in light of her ignorance to the key factual predicate upon which her FCA claim is based revealed during her deposition.

similar "proprietary institutions," as evidenced by a complaint previously filed by Relator's counsel in another jurisdiction.[8]

To constitute a "public disclosure" sufficient to negate FCA jurisdiction, a disclosure need not specifically show fraud, but must merely be "sufficient to put the government on notice of the likelihood of related fraudulent activity." *U.S. ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005); see also *U.S. ex rel. Radcliffe v. Purdue Pharma, L.P.*, 582 F.Supp.2d 766, 770 (W.D. Va. 2008) ("the disclosure must have been of the 'allegations or transactions' on which the *qui tam* action is based, not merely of information used by the *qui tam* relator").

A number of courts have held that a public disclosure does not need to name an FCA defendant specifically. *See, e.g., United States ex rel. Gear v. Emergency Med. Assoc. Of Ill.*, 436 F.3d 726 (7th Cir. 2006); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997)(holding that a Comptroller General Opinion sufficed as a public disclosure despite failing to name a specific violator, where *qui tam* relator "add[ed] only the identity of particular employees' clubs engaged in the questionable and previously documented generic practice"); *Radcliffe*, 582 F. Supp. 2d at 770 (W.D. Va. 2008)("Generally [§3730(e)(4)(A)] does not require that the disclosure be of the specific allegations brought by the relator"). However, other courts have certainly required that public disclosures specifically name a defendant before the public disclosure bar will apply. *See, e.g., Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562 (11th Cir. 1994) (allowing nonspecific disclosures "would preclude any *qui tam* suit once widespread – but not universal – fraud in an industry was revealed."). Thus,

---

[8] That case is *United States ex rel. Debra Leveski v. ITT Educational Services, Inc.*, filed June 3, 2008 in the Southern District of Indiana.

while there is not always an absolute requirement that a disclosure specifically name the defendant, the specificity of a disclosure as to a particular defendant is certainly material in determining whether there has been a public disclosure of the "critical elements" of a relator's allegations.

Strayer cites heavily to *United States ex rel. Schultz v. DeVry, Inc.*, 2009 WL 562286 (N.D. Ill. March 4, 2009), in which the Northern District of Illinois dismissed a very similar case filed by Lopez's current counsel against another "proprietary school," applying the old Seventh Circuit rule which tracks this Circuit's. In *Schultz*, the Court specifically found that the "critical elements of the amended complaint were disclosed through the cases filed against educational institutions based upon the same regulatory scheme and alleged conduct, and the news articles that reported the cases." *Id.* at *2. The Court also found that the relator did not:

> have an understanding of Title IV, and had not seen a program participation agreement...did not contemplate bringing a False Claims Act lawsuit against DeVry until attorney Timothy Matusheski telephoned her...[and]... Matusheski explained the program participation agreement to [relator]. ...[The relator] learned, in a conversation with Matusheski, that DeVry allegedly violated the program participation agreement by compensating recruiters for enrollments..."

*Id.* Here, *Schultz* is instructive as to the numerous "false certification" cases that have been filed[9] and that "[t]hese cases advanced the same allegations. . . that the educational

---

[9] *Schultz* cites to: *United States ex rel. Bowman v. Computer Learning Ctrs.*, 4:99-CV-1138 (S.D.Tex. 1999); *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, No. 4:99-CV-3889 (S.D.Tex 1999); *United States ex rel. Bowman v. Educ. America, Inc.*, 4:00-CV-03028 (S.D.Tex. 2000); *United States ex rel. Gay v. Lincoln Tech. Inst.*, 3:01-CV-00505 (N.D.Tex. 2000); *United States ex rel. Payne v. Whitman Educ. Grp.*, 3:02-CV-00843 and 4:03-CV-3089 (S.D.Tex. 2002); *United States ex rel. Main v. Oakland City Univ.*, 3:03-CV-00071 (S.D.Ind. 2003); *United States ex rel. Hendow v. Univ. of Phoenix*, 2:03-CV-00457 (E.D. Cal. 2003); *United States ex rel. Bott v. Silicon Valley Colls.*, 4:04-CV-00320 (N.D.Cal. 2004); *United States ex rel. Ector v. Axia Coll. Online*, 1:05-CV-01637 (D.D.C.) (2005); *United States ex rel. Torres v. Kaplan Higher Educ.*, 1:07-CV-05643 (N.D.Ill. 2007); *United States ex rel. Cruz v. Western Career Coll.*, 2:07-CV-01666 (E.D.Cal. 2007); *United States ex rel. Leveski v. ITT Educ. Servs., Inc. No.* 1:07-CV-0867 (S.D.Ind. 2007).

14

institutions violated the False Claims Act by agreeing in program participation agreements to comply with Title IV's recruiter compensation restrictions, but failing to comply with the restrictions." *Id.* at *3. Further, the *Schultz* court specifically found it relevant that Mr. Matusheski (Lopez's attorney) sent copies of the *Main* and *Hendow* cases to the plaintiff before filing suit. *Id.*

The government filed a Statement of Interest in this case, voicing its belief that these disclosures failed to put the government on notice of the likelihood of Strayer's alleged fraudulent activity, and stressing that *Schultz* was incorrectly decided. *See* Gov. Stmt. of Int. at 2 ("none of the information cited by [Strayer]...provides the government with information sufficient to identify defendants or possible fraud by defendants"). The government also voiced its concerns that construing a disclosure too broadly has the unfortunate potential to immunize an entire industry simply because one of its constituent members is referenced in such a disclosure. However, as the *Schultz* court tacitly recognized, the nature of the "false certification" claims alleged here make them amenable to formulaic repetition in other cases.[10] Thus, casting the scope of what is properly deemed a "public disclosure" under §3730(e)(4) too narrowly would compromise the efficacy of the public disclosure bar. Importantly, the Court's focus here on a specific relator's claim to an unjustified windfall does not absolve Strayer or any other institution from future liability if they have, in fact, violated Title IV's compensation prohibition.

---

[10] Contrary to the government's fears, the Court's holding today makes no intimation that any other proprietary educational institution is somehow immune from suit simply because similar cases have been filed against other schools in the industry. Rather, this Opinion is focused only on how the filing of these cases applies to the specific facts in the record currently before the Court.

A thorough review of the record before the Court, most notably Lopez's deposition, leaves the Court with no doubt that there has been a public disclosure of the core elements of Lopez's claim.

Though Lopez is correct that many of the disclosures cited to by Strayer fail to name Strayer specifically, they certainly suffice to specifically indicate how other proprietary institutions in the educational industry had purportedly violated Title IV's incentive payment rule and how that violation could act as a basis for an FCA claim. For instance, beginning with *Main*, 426 F.3d at 914, the numerous "false certification" cases filed to date have proceeded from a similar two-step premise of FCA liability. While these cases certainly do not immunize all other similar educational institutions from subsequent suit, they do reveal that this theory of FCA liability, as noted, is susceptible to generic repetition by unqualified relators.

Furthermore, as indicated in the *Schultz* case, Mr. Matusheski clearly looked to cases such as *Main* and *Hendow* before formulating the allegations in the several "false certification" cases he filed. Instructive here is the complaint filed by Lopez's counsel in the aforementioned *Leveski* case. As noted, that complaint was filed on June 3, 2008 in the Southern District of Indiana, two days before Lopez filed her Complaint in the present case. A side-by-side comparison of the complaint filed in the *Leveski* case and the present Complaint reveals that fifty-one of the fifty-eight paragraphs falling under the "Facts" section of Lopez's Complaint repeat, almost entirely word-for-word, the *Leveski* Complaint. *See* Compl. at ¶¶ 14-72. The same is true for the vast majority of the remainder of the Complaint. This similarity is more than coincidental. Lopez's counsel clearly obtained this information from a source other than his client's experiences as a

16

Strayer employee. At oral argument, Lopez's counsel essentially represented that the similarity between the two complaints is attributable to the typical attorney-client relationship, in which a client comes to an attorney with facts, and the attorney merely helps by providing the legal fodder necessary to file a suit. In this case, however, it is clear that the inverse occurred: counsel came to Lopez with the "facts," and Lopez merely helped by providing a name necessary to file suit. Thus, the Court takes the *Leveski* complaint as strong evidence that Lopez's counsel "actually derived" these allegations from publicly-available disclosures.

When considered together with the specific record before the Court in this action, it is clear that the backdrop of these previous "false certification" cases played an integral role in the formulation of Lopez's Complaint. Given that Lopez herself knows nothing about the claims asserted in the Complaint, it is apparent to the Court that these previous "false certification" cases served as both the blueprint and the impetus for this action.

As to those sources which do name Strayer specifically, a 2004 *Washington Post* article cited by Strayer specifically names Strayer in the context of government fraud. *See* Strayer Ex. 23. Similarly, a May 19, 2008 *Dow Jones* article specifically names Strayer along with only three other proprietary educational entities in the context of recruiter compensation and potential government fraud. *See* Strayer Ex. 24. Additionally, in *James v. Strayer Univ.*, 2007 WL 4224694 (E.D. Va. Nov. 27, 2007), this District, though in the context of an employment discrimination suit, specifically discussed Strayer's practice of assigning recruitment goals to admissions officers and that "*[t]he principal evaluation of admissions officers' job performance is their ability to meet or exceed these quarterly goals*, and admissions officers were frequently terminated if they repeatedly

failed to meet their goals." *Id.* at *1 (emphasis added). In that case, Judge Cacheris went on to note:

> In this case, Defendant has provided significant evidence that Plaintiff continually failed to meet her quarterly new student enrollment goals, that her job performance was ranked worst among her co-worker peers despite her greater experience, and that her work was so unsatisfactory that she received formal Performance Improvement Plans from her supervisors highlighting the deficiencies in her job performance and suggesting ways in which she could improve.

*Id.* at *5. The Court finds it improbable that Lopez's counsel was ignorant of the existence of that case, or any of those other disclosures, before initiating the instant suit.

Considering these disclosures in their totality, it is clear to the Court that they are "sufficient to put the government on notice of the likelihood of related fraudulent activity" at Strayer, *Gilligan*, 403 F.3d at 389, and thus the critical elements of Lopez's allegations have been publicly disclosed. The Court so finds.

While Lopez's counsel persists that Lopez, and not any of the preceding sources, is the source of the "core" allegations in the Complaint, the Court cannot accept that argument in light of the foregoing. Rather, the Court must conclude that the real source of the information in Lopez's Complaint is her attorney. Given that her attorney never worked for Strayer, he necessarily obtained his information elsewhere or is just guessing. Of course, direct evidence of the source of Mr. Matusheski's knowledge is beyond the discovery afforded to Strayer. In the Court's judgment, Mr. Matusheski actually derived these allegations from a public disclosure. The Court need not find as a fact that he did so, because it is sufficient to find, as the Court also does, that Plaintiff has failed to meet her burden of proof.

## IV. Conclusion

In the end, "[t]he public disclosure bar is... chiefly designed to separate the opportunistic relator from the relator who has genuine, useful information that the government lacks." *In re Nat. Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009).

Based on the foregoing, the Court concludes Lopez is an opportunistic litigant, adding no value to the government's efforts to combat fraud, and falls well short of meeting her "burden of proving that the allegations underpinning [her] FCA claims were not 'based upon' [a public disclosure.]" *Vuyyuru*, 555 F.3d at 348. Therefore, this Court lacks subject matter jurisdiction over this case and Lopez's claims must be dismissed.

An appropriate order shall issue.

Alexandria, Virginia
March 18, 2010

/s/ LOG
Liam O'Grady
United States District Judge